**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **A.A., by and through his parents, E.L.,** | **:** | |
| **and E.L. and C.L.,** | **:** | |
| | **:** | |
| **Plaintiffs** | **:** | |
| | **:** | |
| **v.** | **:** | **5:05-CV-107 (WDO)** |
| | **:** | |
| **HOUSTON COUNTY SCHOOL** | **:** | |
| **DISTRICT,** | **:** | |
| | **:** | |
| **Defendant** | **:** | |

## ORDER

Plaintiffs are the parents of an autistic child, A.A., and A.A. himself.  After several disagreements between the parents and the Defendant school district over the educational programs selected for A.A. during the 2004-2005 school year, the parents withdrew A.A. from school, only 15 days into the school year.  The parents thereafter filed a complaint with the Office of State Administrative Hearings for the State of Georgia seeking reimbursement for the expense of privately educating A.A. and for private therapy sessions.  The Administrative Law Judge found that the school provided a "free and appropriate education" ("FAPE") to A.A. and that the parents are not entitled to reimbursement for A.A.'s private tutoring.  The parents thereafter exercised their statutory right to file an appeal in this Court.  Along with the issues appealed, the Plaintiffs asserted claims of discrimination on the basis of A.A.'s disability, retaliation, violations of A.A.'s and the parents' rights of privacy, violations of their rights to due process, violation of the Georgia Board of Education Rules, slander, fraud, wrongful interference

1

with a business relationship, breach of contract and promissory estoppel.  Plaintiffs also requested to conduct discovery to supplement the administrative record.  After a scheduling and discovery conference, the Court ordered the parties to file motions for judgment on the record as to the ALJ's decision only and denied additional discovery.

The Court stands by its previous decision to rely on the extensive administrative record created below.  The additional witnesses proffered by the Plaintiffs were well known to the Plaintiffs at the time of the administrative hearing, as was the substance of their proposed testimony, but were not called as part of the administrative hearing.  Second, some of the additional witnesses the Plaintiffs seek to call would testify about matters subsequent to the administrative hearing and of no relevance to the matters before the Court at this time.  The ALJ permitted the attorneys to call as many relevant witnesses as could be called during the two-day hearing and to call additional witnesses by deposition.  Further, the ALJ granted an extension of time for the parties to take the deposition testimony.  Plaintiffs failed to show any gaps in the administrative transcript owing to mechanical failure, the unavailability of any of the proposed witnesses, any improper exclusion of evidence by the ALJ or evidence concerning *relevant* events occurring subsequent to the administrative hearing.  See Walker County, *infra*.  Plaintiffs' Motion to Supplement the record is therefore DENIED.

Based on a review of the administrative record and the arguments presented by the parties' in the previous conferences and hearings, the Court finds that another hearing is unnecessary and Plaintiffs' Motion for a Hearing is DENIED.

Finally, Defendant moved the Court to strike the Plaintiffs' Motion for Judgment on the record as untimely filed.  Although the motion was not filed as ordered by the Court, the Court

will deny the motion to strike at this time, considering the need to have every relevant issue thoroughly argued and considered.  However, Plaintiffs are instructed to file future briefs on time and within the Court's page limitations.

Plaintiff A.A. is a five-year-old autistic child who is entitled to special educational services from the Houston County School District pursuant to the Individuals with Disabilities Education Act ("IDEA").  A.A. first enrolled in the Defendant's school district in December 2002, just after his third birthday.  He was assigned to Matt Arthur Elementary School and placed in a class taught by Amy Wainwright who has training in and experience teaching students with autism and her class has been chosen as a model classroom for teachers from other counties to observe.  Three months after A.A. was placed in Ms. Wainwrights class, A.A. moved to Florida with his family because his stepfather was transferred by the Air Force.  Although the school district rules prohibit slots being "saved" for children, Ms. Wainwright saved a slot for A.A. to return to her classroom.  Nine months later, in January of 2004, A.A.'s family returned to Houston County.  Pursuant to school zoning, A.A. was required to attend a different school. However, because a slot was saved for A.A. and A.A.'s mother specifically requested her son to return to Matt Arthur Elementary to be in Ms. Wainwright's class, an exception was made for A.A.  As the school year came to a close, the parties began to discuss services to be offered during the summer.  A.A.'s mother, E.L., declined because she disagreed with the amount of and types of services the school offered and demanded that the district provide A.A. with 40 hours a week of Applied Behavior Analysis ("ABA") therapy.  E.L. chose to keep A.A. at home and provided some services for him at her expense.  E.L. and the school were in frequent contact throughout the summer regarding the programs and services that would be provided to A.A. upon

3

his return in the Fall of 2004.

A.A. began attending the General Education Pre-K program at Matt Arthur Elementary on August 6, 2004.  The parties met on August 12 to develop A.A.'s Individualized Education Program ("IEP") for the year.  The IEP was to begin on the following Monday.  E.L., E.L.'s current counsel, school administrators, teachers and the school district's counsel attended the IEP meeting.  This was known as the IEP "team."  The IEP team determined that A.A. would receive educational services in the general education ("regular") classes with the support of a paraprofessional who was assigned specifically to A.A. and who would receive training in behavior intervention and data collection from the district's Autism Program Specialist.  Although the paraprofessional did not have all the training necessary at the beginning of the school year, her training had begun.  The IEP team set an academic goal for A.A. to meet 75% of the Georgia Pre-K Standards by the end of the school year using the same curriculum used for all Pre-K students.  The team agreed to increase A.A.'s speech and language services to three weekly, 30-minute sessions and to increase the occupational therapy to two weekly, 30-minute segments.  A.A. also received transportation services from the school.  To address the behavioral problems exhibited by A.A. that were associated with his autism, a Behavioral Intervention Plan ("BIP") was incorporated into the IEP.  The BIP specifically targeted A.A.'s propensity to attempt escapes and his aggressive behaviors such as kicking, biting and yelling.  The team also agreed to assist A.A. with toilet training by implementing "trip training" where A.A. was taken to the bathroom every 30 minutes.  Finally, as part of the IEP, the team agreed to regularly collect data, document A.A.'s progressions and regressions and to provide reports to A.A.'s parents about the daily issues or activities at school.  The parents objected to the IEP because (1) the

paraprofessional assigned to A.A. had not been trained in Applied Behavior Analysis, the educational methodology believed by A.A.'s parents and counsel to be the only effective methodology for teaching A.A., and (2) the amount of time to be spent on ABA therapy, occupational therapy and speech/language therapy.

All children who are covered by the IDEA are entitled to transportation to the school they attend.  During the first week of school, A.A., along with many other students, was made to wait for his assigned bus and had a long ride home, sometimes not getting home until nearly 5:00 in the afternoon.  When E.L. complained to the school about the transportation issue, the school administrators explained that construction on the city roads and additional students new to the bus routes were the causes for the delays.  School personnel explained that the matter was being addressed and would be resolved as soon as possible.  In fact, as a special accommodation to A.A., a special bus route was established so that he would ride on two different busses to arrive home earlier.

Although the school district argues, and the record reflects, that A.A. began to show progress at school immediately, E.L. contends that A.A.'s behavior at home worsened after the school year began because the school was failing in its obligation to provide an FAPE to A.A. A.A.'s teacher, Ms. Townsend, testified that A.A. quickly adapted to many of the routines, was able to interact with adults and children and otherwise behave appropriately.  A.A. worked with shapes, colors, glue, puzzles, phonics, sang songs and learned all the sounds of the alphabet.  Ms. Reagan, the autism teacher, and Ms. Townsend believed that A.A. would have mastered the goals and objectives in the IEP by the end of the school year.  Although A.A. had several instances of typical autistic behavior such as stomping his feet in response to a command, attempting to bite

or hit others or attempting to leave the designated area, the record shows that the teachers and

paraprofessionals were always able to "redirect" him to behave appropriately.  School personnel

did experience difficulty getting A.A. to use the restroom at school but the record shows that has

been an ongoing problem that continues today.  All of these behaviors were documented in a

daily log, minute-by-minute in some instances, so that the IEP team could track A.A.'s progress

and be aware of any area of need.  Those records show that, out of 2,940 minutes logged, only 47

minutes, 1.6% of the time in school, showed signs of "negative" or inappropriate behavior.

Further, the individual instances of inappropriate behavior lasted less than a minute.  E.L. argues

that because A.A.'s behavior drastically regressed *at home* after the beginning of the school year

she sought authorization to educate A.A. at home.

On August 27, 2004, E.L. took A.A. to his pediatrician to obtain a "medical homebound"

form pursuant to which A.A. would be permitted to remain home but continue to receive

educational services from the school.  The pediatrician signed the form based on information

provided by E.L. about how A.A. was behaving at home.  The formed noted the pediatrician's

diagnosis that A.A. was medically required to remain home for at least 30 days, although there

was no indication on the form of a medical condition that prevented him from receiving

educational services at school.  The form was presented to the school and Plaintiffs' attorney

requested another IEP meeting to determine what services would be provided at home.

Because the teachers and other school administrators had not observed any behavior that

evidenced a need to withdraw A.A. from school, the school district responded by letter to the

demand for homebound services and explained that it was unable to determine from the record

then available whether A.A. should be *medically* homebound and requested to speak directly to

the pediatrician concerning the diagnosis.  Plaintiffs' attorney refused and informed the school district's attorney that no medical records would be submitted to the school.  On August 31, Plaintiffs' attorney requested a due process hearing, to which the Plaintiffs' are statutorily entitled when they allege that an FAPE is not being provided by the school.  On September 2, Plaintiffs' attorney obtained another statement by the pediatrician concerning the need for homebound services, some medical records and a demand that an IEP meeting be held immediately.

The pediatrician contacted his personal attorney for advice on whether he could speak with the school district employees and his attorney informed him he could.  The doctor then met with the school nurse, the assistant superintendent and the school district's attorney.  During the meeting, the group informed the pediatrician that the misbehavior at school was predominately focused on the bathroom training issues.  Following that meeting, the doctor executed an affidavit recanting his previous diagnosis, stating that he signed the form based solely on information provided by the mother and that he believed the form was to be used to obtain insurance for the requested homebound services.  A.A. never returned to school.

After the parents and school personnel were unable to come to an agreement on A.A.'s placement, the parents requested a due process hearing before an Administrative Law Judge.  The ALJ held a two-day hearing during which she allowed the parties to submit documentary evidence and live testimony.  After the hearing, the parties took depositions of additional witnesses and submitted the deposition transcripts as part of the hearing record.  The ALJ thereafter found that the school district had provided a "free and appropriate education" ("FAPE") to A.A. and that the parents were not entitled to reimbursement for private tutoring,

therapy or daycare.  The relevant factual and legal findings are as follows:

- As to the August 12, 2004 IEP, the school district complied with all the procedural requirements of the IDEA.  Specifically, the parents were provided with sufficient prior notice of the meetings and the purpose for the meetings and they participated fully, together with their attorney, in the development of the IEP.

- The parents identified no procedural violations related to the development of the IEP and the Eleventh Circuit has recognized that procedural violations of the IDEA must cause actual educational harm.  See K.C.; Weiss; Doe, *infra*.

- The IEP was reasonably calculated to provide A.A. with educational benefits in the least restrictive environment because A.A. was placed in a regular Pre-K classroom with "typical or non-disabled" four and five-year-old students for the entire school day.

- A.A.'s goal of meeting 75% of Georgia's Pre-K standards by the end of the school year was appropriate.

- The IEP set forth significant "related services" to address A.A.'s speech, language and occupational therapy needs as well as goals drafted to address those needs.

- The paraprofessional services provided was appropriate for A.A.'s needs.

- The IEP appropriately addressed A.A.'s autism-associated behaviors

After taking all of the facts into consideration, the ALJ determined that in the 15 days A.A. attended school he had made significant progress that demonstrated the efficacy of the IEP and related services.  Because the ALJ found that the school provided A.A. with a "free and appropriate education," she declined to reach the issue of reimbursement or compensatory

services.  The ALJ next addressed the parents' contention that the school discriminated against A.A. in violation of § 504 of the Rehabilitation Act in the manner in which the school district transported A.A. to and from school.  The ALJ found there was no evidence the delay in getting A.A. home was motivated by an intent to discriminate against A.A.  The ALJ further found there was no evidence that non-disabled students had not also been delayed because of the road construction problems and additional students added to the bus routes.  Finally, the ALJ found that A.A. was not entitled to homebound services because there was no evidence of a medical condition necessitating the same.

In 1975, Congress enacted the Education of the Handicapped Act, 20 U.S.C. § 1401 *et seq*.  The name of the Act was later changed to the Individuals with Disabilities in Education Act, or, "IDEA."  Through the IDEA, Congress financially assists state and local agencies in the education of handicapped children and conditions such funding upon compliance with extensive goals and procedures.  Bd. of Edu. v. Rowley, 458 U.S. 176 (1982).  "The Act represents an ambitious federal effort to promote the education of handicapped children, and was passed in response to Congress' perception that a majority of handicapped children in the United States 'were either totally excluded from schools or were sitting idly in regular classrooms awaiting the time when they were old enough to 'drop out.'"  Id. at 180 (citing H.R.Rep.No. 94-332, p. 2 (1975) (H.R.Rep.)).

Rowley, the first Supreme Court case to interpret the IDEA, involved a suit brought by parents who complained about the school district's failure to provide a sign language interpreter for their hearing-impaired child.  In addressing whether this violated the IDEA, the court set forth the following analysis of the IDEA, the educational goals and legal requirements of the IDEA

9

and the means of implementing those requirements:

> States receiving money under the Act must provide education to the handicapped by priority, first to handicapped children who are not receiving an education and second to handicapped children with the most severe handicaps who are receiving an inadequate education, § 1412(3), and to the maximum extent appropriate must educate handicapped children with children who are not handicapped. § 1412(5). The Act broadly defines "handicapped children" to include mentally retarded, hard of hearing, deaf, speech impaired, visually handicapped, seriously emotionally disturbed, orthopedically impaired, and other health impaired children, and children with specific learning disabilities. § 1401(1).

> In addition to covering a wide variety of handicapping conditions, the Act requires special educational services for children regardless of the severity of their handicap. §§ 1412(2)(C), 1414(a)(1)(A).

> The "free appropriate public education" required by the Act is tailored to the unique needs of the handicapped child by means of an "individualized educational program" (IEP). § 1401(18). The IEP, which is prepared at a meeting between a qualified representative of the local educational agency, the child's teacher, the child's parents or guardian, and, where appropriate, the child, consists of a written document containing

> • a statement of the present levels of educational performance of such child,

> • a statement of annual goals, including short-term instructional objectives,

> • a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs,

> • the projected date for initiation and anticipated duration of such services, and

> • appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved. § 1401(19).

> Local regional educational agencies must review, and where appropriate revise, each child's IEP at least annually. §§ 1414(a)(5), 1413(a)(11).

> In addition to the state plan and the IEP already described, the Act imposes extensive procedural requirements upon States receiving federal funds under its

provisions.  Parents or guardians of handicapped children must be notified of any proposed change in the identification, evaluation, or educational placement of the child or the provision of a free appropriate public education to such child, and must be permitted to bring a complaint about any matter relating to such evaluation and education.  § 1415(b)(1)(D) and (E).

Complaints brought by parents or guardians must be resolved at an impartial due process hearing, and appeal to the state educational agency must be provided if the initial hearing is held at the local or regional level.  § 1415(b)(2) and (c).  Thereafter, any party aggrieved by the findings and decision of the state administrative hearing has the right to bring a civil action with respect to the complaint in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy.  § 1415(e)(2).

Thus, although the Act leaves to the States the primary responsibility for developing and executing educational programs for handicapped children, it imposes significant requirements to be followed in the discharge of that responsibility.  Compliance is assured by provisions permitting the withholding of federal funds upon determination that a participating state or local agency has failed to satisfy the requirements of the Act, §§ 1414(b)(2)(A), 1416, and by the provision for judicial review.

Rowley, 458 U.S. at 181-184.

The Act sets forth a preference for "mainstreaming" handicapped children by educating them with nonhandicapped children.  However, Congress recognized that regular classrooms would not always be a suitable setting for the education of some handicapped children.  The Act expressly acknowledges that the nature or severity of the handicap may be such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily and provides for the education of some handicapped children in separate classes or institutional settings.  Id. (citing §§ 1412(5), 1413(a)(4)).

The term "free appropriate public education" means special education and related services which

• have been provided at public expense, under public supervision and direction, and

11

without charge,

- meet the standards of the State educational agency,

- include an appropriate preschool, elementary, or secondary school education in the State involved, and

- are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.

Rowley, 458 U.S. at 188 (citing U.S.C. § 1401(18)).

"Special education," . . . means specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a handicapped child, including classroom instruction, instruction in physical education, home instruction, and instruction in hospitals and institutions.

"Related services" are defined as transportation, and such developmental, corrective, and other supportive services as may be required to assist a handicapped child to benefit from special education.

Id. (citing §§ 1401(16), 1401(17)).

Noticeably absent from the IDEA is any requirement that schools maximize the potential

of handicapped children commensurate with the opportunity provided to other children.  Id

Congress did not impose upon the States any greater substantive educational standard than would be necessary to make such access meaningful.  Indeed, Congress expressly recognized that in many instances the process of providing special education and related services to handicapped children is not guaranteed to produce any particular outcome.  S.Rep., at 11, U.S.Code Cong. & Admin.News 1975, p. 1435.  Thus, the intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside.

Id. at 192.  Further, there is no evidence of Congressional intent to achieve strict equality of

opportunity or services.  Id. at 199-200.

The educational opportunities provided by our public school systems undoubtedly differ from student to student, depending upon a myriad of factors that might affect a particular student's ability to assimilate information presented in the

classroom.  The requirement that States provide "equal" educational opportunities would thus seem to present an entirely unworkable standard requiring impossible measurements and comparisons.  Similarly, furnishing handicapped children with only such services as are available to nonhandicapped children would in all probability fall short of the statutory requirement of "free appropriate public education"; to require, on the other hand, the furnishing of every special service necessary to maximize each handicapped child's potential is, we think, further than Congress intended to go.  Thus to speak in terms of "equal" services in one instance gives less than what is required by the Act and in another instance more. The theme of the Act is "free appropriate public education," a phrase which is too complex to be captured by the word "equal" whether one is speaking of opportunities or services.

. . .

If sufficient funds are not available to finance all of the services and programs that are needed and desirable in the system then the available funds must be expended equitably in such a manner that no child is entirely excluded from a publicly supported education consistent with his needs and ability to benefit therefrom.

Id.

"Congress sought primarily to identify and evaluate handicapped children, and to provide them with access to a free public education."  Id. at 200.  "Implicit in the congressional purpose of providing access to a 'free appropriate public education' is the requirement that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child."  Id.  "The statutory definition of 'free appropriate public education,' in addition to requiring that States provide each child with 'specially designed instruction,' expressly requires the provision of 'such supportive services as may be required to assist a handicapped child to benefit from special education.'"  Id. at 201 (citing § 1401(17)).  "We therefore conclude that the 'basic floor of opportunity' provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child."  Id.  There is no one test for determining the

13

adequacy of educational benefits covered by the Act.  Id. at 202.

The IDEA permits any party aggrieved by the findings and decision of a state administrative hearing to bring a civil action in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy.  Id. at 204 (citing § 1415(e)(2)).  "The complaint, and therefore the civil action, may concern 'any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child.'"  Id. at 204-205 (citing § 1415(b)(1)(E)).  In reviewing the complaint, a court reviews the record of the state administrative proceedings, hears additional evidence if necessary, and bases its decision on the preponderance of the evidence granting such relief as the court determines is appropriate.  Id. at 205 (citing § 1415(e)(2)).  However, this standard "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review."  Id. at 207. The IDEA has an implied requirement that due weight shall be given to the state administrative proceedings.  "Therefore, a court's inquiry in suits brought under § 1415(e)(2) is twofold.  First, has the State complied with the procedures set forth in the Act?  And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?  If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more."  Id.  "Congress' intention was not that the Act displace the primacy of States in the field of education, but that States receive funds to assist them in extending their educational systems to the handicapped.  Therefore, once a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States."  Id. at 209.

In Rowley, the court applied the foregoing analysis to the parents' claim that the school violated the IDEA regarding the education provided to their hearing-impaired child.  The court found the evidence showed the child performed better than the average child in her class, advanced easily from grade to grade and received personalized instruction and related services calculated by school administrators to meet her educational needs.  The court therefore found the IDEA did not require the school to provide a sign language interpreter for the child as demanded by her parents.

In JSK v. Hendry County Sch. Bd., the Eleventh Circuit addressed a case where the parents of an autistic child challenged the child's IEP.  JSK v. Hendry County Sch. Bd., 941 F.2d 1563 (11th Cir. 1991).  The court held that the question of "whether an IEP provided a 'free appropriate public education' that educationally benefitted the handicapped child is a mixed question of fact and law subject to de novo review."  Id. at 1571 (citations omitted).  The court rejected the parents' claims that "meaningful educational benefit" means anything more than "some" or "adequate" educational benefits.  Id. at 1572 (citing Drew P. v. Clark County Sch. Dist., 877 F.2d 927 (11th Cir. 1989)).  Discussing the standard of review, the court stated that "great deference must be paid to the educators who developed the IEP."  Id. at 1573.  Importantly, the court rejected the parents' claim that a child must, through his IEP, make "meaningful gains" not only in the classroom but in other settings.  Id.

In Walker County v. Bennett, the parents of an autistic child sought reimbursement for the costs of privately educating their child.  Walker County Sch. Dist. v. Bennett, 203 F.3d 1293 (11th Cir. 2000).  After the school filed a motion to supplement the administrative record, the district court required a proffer of the evidence the school wished to present.  The school

responded by listing the names of 19 witnesses plus three categories of tangible or documentary evidence.

> The court found that five of the witnesses had already testified to the same general subject matter at the administrative hearing, and that the proposed testimony of several of the remaining witnesses was already in the record in the form of their written reports or the testimony of other witnesses who had described their findings, so that, in either case, the proposed testimony before the district court would be cumulative. In two instances the court found the proffered testimony to be irrelevant. The court also found that all of the proffered witnesses who had not already testified were available at the time of the administrative hearing; that no explanation was given for not calling them at that time; and that permitting them to be called in the district court would raise the dual concerns of unfairly permitting the parties to reserve their best evidence for trial while essentially converting an administrative review proceeding into a trial de novo. Thus, with two minor exceptions, the district court concluded that the admission of any of the additional evidence in the judicial review proceedings would not only be cumulative but would undercut or unduly minimize the statutory role of the administrative process thereby resulting in an unnecessary expenditure of judicial resources.

The district court excluded all of the School District's proffered evidence except for a portion of the deposition testimony of one witness and some additional documentary evidence and set forth examples of when additional evidence may be necessary:

- gaps in the administrative transcript owing to mechanical failure,

- unavailability of a witness,

- improper exclusion of evidence by the administrative agency and

- evidence concerning relevant events occurring subsequent to the administrative hearing.

Id. at 1296-1298. "A practical approach, we believe, is that an administrative hearing witness is rebuttably presumed to be foreclosed from testifying at trial." Id. See also School Bd. of Collier County, Fla. v. K.C.. 285 F.3d 977, 981 (11th Cir. 2002) (the IDEA specifically provides that the

court may take additional evidence and may fashion relief that the court deems appropriate; parties must provide a solid justification for the additional evidence)

In Loren v. AISS, the parents of a child with a learning disability sought reimbursement for the costs of privately educating their child after the school allegedly failed to provide an FAPE for their child.  Loren F. v. Atlanta Indep. Sch. System, 349 F.3d 1309 (11th Cir. 2003). After restating the principles set forth above, the court addressed the claim for reimbursement by first noting that, although the IDEA reflects a preference in favor of providing special education in public schools, it recognizes that certain public schools are unable or unwilling to provide appropriate special education services.  The IDEA, therefore, provides that the cost of the private school may be reimbursed if the public school did not make an FAPE available to the child.  Id. at 1312 (citing 20 U.S.C. § 1412(a)(10)(C)(ii)).

"Even where an FAPE is not provided, courts can nevertheless deny reimbursement if a parent's own actions frustrated the school's efforts."  Id. (citing MM v. Sch. Dist. of Greenville County, 303 F.3d 523, 533-35 (4th Cir. 2002) (school district not liable for its failure to timely complete IEP where parents ceased to cooperate in IEP's completion, preferring to place child in private school); Doe v. Defendant I, 898 F.2d 1186, 1189 n.1 (6th Cir. 1990) (parent could not complain that school district failed to complete a timely IEP when IEP's non-completion was attributable to parent's request that school allow student to perform on his own for a while)). "[C]ourts should be reluctant to award monies to parents who refuse or hinder the development of an FAPE or IEP."  Id. at n.2.  Courts can also deny or reduce reimbursement if "parents fail to give the school proper notice that they reject the school's IEP and/or are removing their child from the school."  Id. at 1313.  The IDEA provides that the cost of reimbursement may be

reduced or denied if:

- at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or

- 10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described [above];

- if, prior to the parents' removal of the child from the public school, the public agency informed the parents, through the notice requirements described in section 1415(b)(7) of this title, of its intent to evaluate the child (including a statement of the purpose of the evaluation that was appropriate and reasonable), but the parents did not make the child available for such evaluation; or

- upon a judicial finding of unreasonableness with respect to actions taken by the parents.

Notwithstanding these notice requirements, the cost of reimbursement may not be

reduced or denied for failure to provide such notice if

- the parent is illiterate and cannot write in English;

- compliance with this section would likely result in physical or serious emotional harm to the child;

- the school prevented the parent from providing such notice; or

- the parents had not received notice from the school as set forth above.

20 U.S.C. § 1412; 34 C.F.R. § 300.403.

Summary judgment in IDEA cases is appropriate even when facts are in dispute, and is

based on a preponderance of the evidence. "That is why the district court's decision 'is perhaps

better described as judgment on the record.'" Loren, 349 F.3d at 1313. (citing Slama v. Indep.

Sch. Dist., No. 2580, 259 F. Supp.2d 880, 882 (D. Minn. 2003) (On motion for judgment on the

record in an IDEA suit, the district court "may make a decision on the merits, even if there exist, upon the stipulated record, disputed issues of material fact")). "That means that the usual F.R. Civ. P. 56 summary judgment principles do not apply in an IDEA case. This is not surprising because no IDEA jury trial right exists." Id. (citing Whitehead v. Sch. Bd. for Hillsborough Co., 918 F. Supp. 1515, 1518 (M.D.Fla.1996) (Because only injunctive relief and equitable damages are allowed under the IDEA, there is no jury trial right for IDEA claimants)). "The district court often conducts 'a bench trial on a stipulated record.'" Id. (citation omitted). District judges are not prevented from "factfinding under Federal Rule 52 in IDEA cases – even on a record bearing evidence tendered in addition to the IDEA administrative record – subject to the requirement that they accord 'due weight' to administrative findings." Id. at 1314. Courts owe some judicial deference to local administrative agency judgments though that is typically limited to matters calling upon educational expertise. Id. at 1314 n.5 (citations omitted). "To that end, administrative factfindings are considered to be prima facie correct, and if a reviewing court fails to adhere to them, it is obliged to explain why." Id. (citations omitted). See also Weiss v. Sch. Bd. of Hillsborough County, 141 F.3d 990 (11th Cir. 1998) (Rehabilitation Act claims fail when based on the same facts as IDEA claims that are dismissed).

In Loren, the child was withdrawn from school only five days after she began. Three days after she left, the mother sent the school a letter rejecting the IEP and informing the school that Loren would be attending private school. "She, in essence, stated her belief that the school could not meet her son's needs. This was the parents' first formal IEP rejection notice to the [school]." Id. at 1315. The school attempted to contact the parents to arrange a meeting to review the child's IEP. The parties disputed how many notices the school sent and whether the parents

received them or responded to them.  The court of appeals held that there were too many disputed

issues between the parties regarding the parents' unreasonableness in not working with the

school and remanded for further findings on:

- whether the child was provided an FAPE;

- whether the school complied with the IDEA's procedures;

- whether the IEP developed through those procedures was reasonably calculated to enable the child to receive educational benefits;

- if the child was not provided an appropriate FAPE or IEP, whether the parents contributed to, and to what extent, the failure to provide the child with an appropriate FAPE or IEP by either being unavailable themselves or in not making the child more available to the school;

- whether the parents acted unreasonably;

- when was the child "removed" from public school under the IDEA – that is was the child removed when he stopped attending on 8/18/00, when his mother sent a formal rejection of the IEP on 8/21/00, when the child actually enrolled in private school, or on some other date;

- whether the parents complied with the notice requirement in the statutes; and

- whether the safe harbor provision of the statute was applicable to the case.

Id. at 1319.

In the case at bar, the Defendant school district addressed A.A.'s unique educational and

psychological needs through the development of his "individualized educational program" (IEP).

The IEP was prepared after numerous meetings, phone calls and emails between qualified

representatives of the school district, A.A.'s teacher and A.A.'s parents. The IEP clearly set forth

(1) a statement of A.A.'s present levels of educational performance, (2) a statement of annual

goals for A.A., including short-term instructional objectives, a statement of the specific

educational services to be provided, the extent to which A.A. would be able to participate in

regular educational programs and the duration of the necessary services and (3) objective criteria,

evaluation procedures and schedules for determining, on an annual and more frequent basis,

whether the instructional objectives were being achieved.  Importantly, the school clearly adhered

to the IDEA's preference for "mainstreaming" handicapped children by educating A.A. with

"general education" children.

       The school district has shown that they met, and exceeded, the requirements of the IDEA

as interpreted by <u>Rowley</u>, *supra*.  The school provided an appropriate education program to A.A.

at public expense, under public supervision and direction, and without charge to A.A.'s parents.

"Related services" were provided such as specially designed transportation and developmental,

corrective, and other supportive services to assist A.A. to benefit from his special education

program.  Because the applicable statutes and regulations do not impose any substantive standard

prescribing the level of education to be afforded to A.A., the Court will not do so.  The Court can

certainly sympathize with the mother's wishes that her son receive the best education possible,

but the school was not required to maximize A.A.'s potential commensurate with the opportunity

provided to other children.  Congress did not impose upon schools any greater substantive

educational standard than would be necessary to make A.A.'s access to education meaningful.

Further, neither the statutes nor the case law requires that A.A. show progress at home as

demanded by A.A.'s parents and counsel.  The school is only required to ensure that he received

educational benefits *at school*.  Just as there is no one test for determining the adequacy of

educational benefits covered by the IDEA, there is no one educational methodology that is

superior to all others.  Although A.A.'s mother argues the school should have taught only the

methods preferred by her and her attorney, the school developed an educational program that implemented numerous educational philosophies in order to develop a program specifically tailored to A.A.'s needs.

This Court is not permitted to substitute its own notions of educational policy for those of the school authorities reviewed herein. Due weight must be given to the school's decisions on how to educate A.A. and to the ALJ's administrative proceedings and findings. The school went above and beyond what is required by the IDEA and the applicable regulations. A.A.'s IEP was reasonably calculated to enable him to receive educational benefits. The IEP's goals were that A.A. would complete at least 75% of the state's regular Pre-K requirements. A.A.'s teachers and the school's expert, who is one of only a few individuals in the state with a doctoral degree in this area, testified that A.A. was making progress in the 15 days he attended school that it was their belief he would have met the annual goals if his mother had not withdrawn him from school. Since the IDEA's requirements were met, the Court finds that the school district complied with the obligations imposed by Congress.

One of the parents' primary objections is the school's decision to not provide A.A. with a "one-on-one" paraprofessional who would follow him around throughout the entire school day. The parents believe this was necessary because, in their opinion, A.A. needed the continuous presence of someone who was a familiar face so that he would stay on track and not regress. The school however accepted the recommendations of its experts that a one-on-one paraprofessional was not necessary for A.A. because A.A. was able to function in a regular classroom and a one-on-one aid would cause A.A. to become too dependent on the aid such that teachers, parents and other individuals would be unable to successfully work with him. Plaintiffs' argument regarding

the paraprofessional has no merit.

Another disputed issue is whether A.A. was in school prior to the development of an IEP in violation of the IDEA.  In <u>Doe v. Alabama State Dept. of Educ.</u>, the court recognized that "Federal Regulations require that an IEP be in effect before special education and related services are provided to a child.  Additionally, the IEP must be implemented as soon as possible following the required meetings."  <u>Doe v. Alabama State Dept. of Educ.</u>, 915 F.2d 651, 663 (11th Cir. 1990) (citing 34 C.F.R. § 300.342(b)).  "The district court found that [the child] did in fact receive services in the spring of 1987 without the benefit of an IEP.  The court noted, however, that during this time the school was in frequent contact with the Does, attempting to work out an IEP that would be acceptable to them."  <u>Id.</u>  The delay in formalizing an IEP was the result of the Does' active participation in the IEP process.  The court of appeals held "that the district court was not clearly erroneous in concluding that the delay in formulating the IEP was caused by the Does and does not constitute a violation of the procedural requirements of the EHA."  <u>Id.</u> (citation omitted).

In the case at bar, A.A. was in school for about a week without an IEP specifically tailored for that school year but there were previous IEPs in place that were being followed. Further, as in <u>Doe</u>, A.A.'s parents were in constant contact with the school developing an IEP and throughout that period of time A.A. was closely observed by his teachers and other school personnel for any problems.  No harm was caused by the absence of an IEP during that short period of time.

Even if the Court found that a "free and appropriate education" was not provided to A.A., the Court would deny reimbursement based on the parents' actions that continually frustrated the

school's efforts.  The parents and their counsel continually hindered the development of an FAPE

and IEP for A.A.  A review of the various emails and letters from Plaintiffs' counsel and the

letters from A.A.'s mother to the school show extreme unreasonableness and inflexibility.  The

parents would therefore be ineligible for any reimbursement for the private services they

procured.

Finally, Plaintiffs contend that the ALJ did not have jurisdiction to rule on whether the

school district discriminated against A.A. in violation of Section 504 of the Rehabilitation Act.

"Section 504 of the Rehabilitation Act prohibits discrimination against the disabled by recipients

of federal funding . . .  Both provisions are enforceable through private causes of action."  Barnes

v.Gorman, 536 U.S. 181, 184-85, 122 S. Ct. 2097 (2002).  The section cited by Plaintiffs for their

argument that the ALJ did not have jurisdiction over this issue, 20 U.S.C. §1415(l), simply states

that nothing in the IDEA may be construed to restrict or limit the rights or remedies available

under the Constitution, the ADA, the Rehabilitation Act or other Federal laws protecting the

rights of children with disabilities, except that before the filing of a civil action under such laws

seeking relief that is also available under the IDEA, the procedures set forth in the IDEA for

bringing claims must be exhausted to the same extent as would be required had the action been

brought under the IDEA.  Further, the state regulations governing IDEA due process hearings

clearly permit the consideration of Rehabilitation Act and ADA claims.  See GA ADC 160-4-7-

.18(1)(g)(10).  The ALJ therefore had jurisdiction to rule on the Rehabilitation Act claims.

As to the validity of the Plaintiffs' Rehabilitation Act claims, there is simply no evidence

whatsoever of discrimination, intentional or otherwise, on the part of the school regarding how

A.A. was transported to and from school.  The record shows, and the parents do not dispute, that

road construction delays and additional students added to the bus routes were the reasons for the delay in transporting ALL of the children home.  The ALJ correctly held that the school district did not discriminate against A.A. in violation of the Rehabilitation Act regarding the issue of the transportation.  Because the Rehabilitation Act claim is based on the same facts and arguments as the IDEA claims, the Rehabilitation Act claim has no merit and is dismissed.  Weiss, 141 F.3d at 998.

Based on the foregoing, the Court affirms all of the findings made by the ALJ.  Because the administrative record is extensive and appears to include all of the facts that could possibly be legally relevant to the remaining issues, the parties will not be permitted to engage in a prolonged discovery period.  This matter will be set down for a scheduling and discovery conference as soon as possible during which a short discovery period and dispositive motion deadline will be set.

**SO ORDERED this 3rd day of January, 2006.**

**S/Wilbur D. Owens, Jr.**
**WILBUR D. OWENS, JR.**
**UNITED STATES DISTRICT JUDGE**